[Civ. No. 789.   Third Appellate District.—November 7, 1910.]

HOWARD HUNTINGTON et al., Petitioners, v. C. F. CURRY, as Secretary of State of California, Respondent.

STREET RAILROAD CORPORATIONS—FORMATION—PROVISIONS AS TO RAILROAD CORPORATIONS INAPPLICABLE—MANDAMUS.—Sections 291, 293, 294 and 295 of the Civil Code, applying to the formation of railroad corporations, do not apply to the formation of street railroad corporations, and the articles of incorporation of the latter are not required to set forth subdivisions 2, 3 and 4 of said section 291, nor is a street railroad corporation required to file with the Secretary of State the affidavit of the payment of ten per cent of the subscribed capital stock provided for in said section 295; and where a street railroad corporation otherwise complies with the law of its incorporation, and the Secretary of State has refused to file its articles of incorporation upon tender of the fees therefor, *mandamus* will lie to compel him to file the same upon payment of such fees, and to issue the proper certificate of incorporation.

ID.— POWERS STATED IN ARTICLES—MOTIVE POWER—EXTENSION OF STREET RAILROAD—CONSTRUCTION OF CODE.—Where the street railroad corporation, in its articles, enumerated as its powers, "To construct, or acquire by purchase or lease or otherwise, and to operate, control, maintain, improve or extend street railroads propelled or operated by electricity or other motive power within the city of Los Angeles, California, and within the territory immediately adjacent thereto, in the county of Los Angeles," the provision for the use of other motive power was not improperly inserted, in view of the possible contingency of steam power, under sections 497 and 509 of the Civil Code, without making it a commercial railroad; and the authority to operate beyond the city of Los Angeles does not take from it the essential character of a "street railroad."

ID.—POLICY OF LAW AGAINST CUSTOMARY USE OF STEAM POWER.—It is the policy of the law, for good reasons, that street railroads shall

not customarily be operated by steam power, and such power may be used only upon the happening of the contingency provided for in the Civil Code.

ID.—CONSTRUCTION OF "OTHER MOTIVE POWER" IN ARTICLES.—It is not to be assumed that the provision in the articles as to "other motive power" than those expressly enumerated in section 497 is intended to invest the corporation with power in that respect, in any measure in excess of that prescribed by the several code sections on that subject.

ID.—DISTINCTION BETWEEN STREET RAILROADS AND COMMERCIAL RAILROADS—LENGTH AND LOCAL CHARACTER.—There is a clear and marked distinction between street railroads and commercial railroads. The termini of a commercial railroad may be hundreds of miles apart, while a street railroad is local in its origin, nature and character, whether it operates its road wholly in a city, or partly in the city and partly in the country, under distinct franchises constituting one continuous local line of street railroad.

ID.—DISTINCT MODES OF BUSINESS, OBJECTS AND PURPOSES.—The street railroad and the commercial railroad are distinct, both as to the mode and manner of doing their business and in their object and purposes. They are in no sense competitors.

ID.—DISTINCT RIGHTS IN USE OF STREETS AND IN NATURE OF FRANCHISE. An ordinary railroad obtains its franchise by incorporation for the purpose of extending its line between its termini, and its right to use a street is no part of its franchise, but is a mere right of way constituting part of its roadway. But the right which a street railroad obtains from the city to lay its track and operate its road in its streets is the most valuable part of the franchise. It does not receive it from being incorporated, but obtains it afterward by special grant from the municipality, which includes both the roadway and the franchise.

ID.—DISTINCT NATURE OF TRAFFIC—GENERAL AND LOCAL.—A commercial railroad company engages in a general traffic, and is unfitted to engage in the purely local traffic which characterizes the street railroad company.

ID.—DISTINCTION AS TO ESTIMATED LENGTH OF ROAD.— The requirement that a railroad company shall make an estimate of its length is very easy of accomplishment; while such an estimate of length cannot be required of a street railroad company, whose line must vary in length according to the requirements of local business, both in and outside of the limits of the city, to be determined by the local authorities.

PETITION for writ of mandate to the Secretary of State.

The facts are stated in the opinion of the court.

White, Miller & McLaughlin, for Petitioner.

Malcolm Glenn, Assistant Attorney General, for Respondent.

HART, J.—This is a petition for a writ of mandate to compel the respondent, as Secretary of State, to file certain articles of incorporation, to issue the certificate of incorporation, and "do all other acts and things which are necessary or proper to be done in the matter of filing, certifying and issuing articles of incorporation," etc.

The articles of incorporation which respondent has refused to file in his office are annexed to and made a part of the petition.

From the allegations of the petition it appears that the petitioners, at some time prior to the nineteenth day of October, 1910, associated themselves together for the purpose of forming a corporation under the laws of this state, to be known as the "Los Angeles Railway Corporation"; that, pursuant to said purpose, there were prepared, in alleged compliance with the requirements of the law, articles of incorporation of said railway corporation, and said articles, so prepared and "duly subscribed and executed," were filed in the office of the county clerk of the county of Los Angeles, who, upon the filing of said articles, made and delivered to petitioners a copy thereof, duly certified and attested by him as county clerk, under the seal of his office.

The petition further alleges that, on the twentieth day of October, 1910, the petitioners presented said certified copy of articles of incorporation to the respondent for filing in his office, and requested him to file the same therein, but that, notwithstanding that at the time of said request and demand so made of and on respondent the sum of $2,000, the filing fee required by law, together with the sum of $187.50, the license fee for said corporation for one year, and the further sum of $7.50 for recording the articles of incorporation, issuing his certificate of incorporation and issuing a certified copy of said articles of incorporation, were tendered to said respondent, as such Secretary of State, he refused and still refuses to accept said fees and to file said

articles of incorporation or to perform the other acts mentioned and required of him in his official capacity in such case.

It is averred that the refusal by the respondent to file said articles of incorporation is founded solely upon the ground that said articles of incorporation were not prepared in obedience to and are, therefore, not in accord with the requirements of sections 291, 293, 294 and 295 of the Civil Code of this state.

The attorney general has appeared here for the respondent, and vigorously insists upon the impregnability of the secretary's construction of the sections of the Civil Code mentioned. The question to be decided is raised by demurrer to the petition.

Section 291 of said code reads as follows:

"The articles of incorporation of any railroad, wagon road, or telegraph organization must also state:

"1. The kind of road or telegraph intended to be constructed;

"2. The place from and to which it is intended to be run, and all the intermediate branches;

"3. The estimated length of the road or telegraph line;

"4. That at least ten per cent of the capital stock subscribed has been paid in to the treasurer of the intended corporation."

Section 293 provides that each proposed corporation mentioned in section 291, "before filing articles of incorporation, must have actually subscribed to its capital stock, for each mile of the contemplated work, the following amounts, to wit:

"1. One thousand dollars per mile of railroads. . . ."

By the terms of section 294, before the articles of incorporation referred to in the "preceding section" are filed, "there must be paid for the benefit of the corporation, to a treasurer elected by the subscribers, ten per cent of the amount subscribed."

Section 295 reads: "Before the Secretary of State issues to any such corporation a certificate of the filing of articles of incorporation, there must be filed in his office an affidavit of the president, secretary, or treasurer named in the articles, that the required amount of the capital stock thereof

has been actually subscribed, and ten per cent thereof actually paid to a treasurer for the benefit of the corporation.''

The petitioners here did not, at the time of requesting and demanding the filing of the articles of incorporation involved in this proceeding, present therewith for filing the affidavit required by section 295, nor do their articles of incorporation contain the statement required by section 291, their contention being that the sections of the Civil Code referred to have no application to street railroad corporations, and after a careful examination and analysis of the code sections pertaining to railroad corporations of both kinds—the ordinary commercial railroads and street railroads—we are persuaded that the position of petitioners is sound.

But the attorney general first takes the position that the articles of incorporation concerned here themselves disclose that the proposed corporation is not thus confined to the operation of a street railroad, but that, should the organization be consummated according to law, it would be authorized, by a certain provision of the articles, to conduct and operate an ordinary commercial railroad. This contention proceeds from the following language in said articles enumerating the powers of the proposed corporation: ''To construct, or acquire by purchase or lease, or otherwise, and to operate, control, maintain, improve and extend street railroads propelled or operated by electricity, *or other motive power,* within the city of Los Angeles, California, *and within the territory immediately adjacent thereto in the county of Los Angeles.''*

It is claimed that the authority thus vested in the corporation to propel or operate street railroads by means of ''other motive power'' than electricity, etc., is evidence of an intention or purpose on the part of and will authorize petitioners to operate, under said articles of incorporation, a regular commercial and not a street railroad; that such intention or purpose is further disclosed by the fact that the laying of the tracks of the railroad proposed to be constructed or acquired and operated by said intended corporation is not, as is required of street railroad corporations by section 497 of the Civil Code, limited to the use of the streets of the city of Los Angeles for that purpose, since it is also provided that the tracks of such railroad may be ex-

tended to any point "within the territory immediately adja-- cent" to said city, in the county of Los Angeles.

The argument in effect appears to be, as to the first of these two propositions, that had the petitioners intended to construct and operate, under their articles, a street railroad only, they would not have authorized themselves by their charter to operate such a road by means of any other motive power than those to the use of which section 497 limits street railroad corporations. By that section it is provided that in no case shall permission be granted by the governing board of any municipality to any street railroad corporation to propel cars upon railroad tracks laid for street railroad purposes "otherwise than by electricity, horses, mules, or by wire ropes running under the streets and moved by stationary engines, *unless for special reasons in this title hereinafter mentioned.*" (Italics ours.)

We think that a sufficient answer to this contention may be found in the fact that the articles of incorporation expressly declare that the purpose of the corporation is "to construct or acquire . . . and to operate, control, maintain, improve and extend *street railroads,*" and if the language in said articles to which the attorney general objects clothes the corporation with more power as to the means of propelling its cars than it is entitled to under the law, it must be presumed that the local authorities through whom its franchises must be secured, if at all, will not override the law, but will require the corporation, by appropriate and legal conditions and restrictions, to conduct the business for which it has been given existence in all respects strictly according to the mandates of the statutes. But we are not prepared to say, in view of the language of section 509 of the Civil Code, that it is not proper to make provision in the articles of incorporation for propelling and operating street railroads by "other motive power" than by electricity, horses, mules, etc. Said section reads, in part, as follows: "The corporate authorities of any city or town, or city and county, may grant the right to use steam or any other motive power in propelling the cars used on such grading-track, when public convenience or utility demands it, but the reasons therefor must be set forth in the ordinance, and the right to rescind the ordinance at any time reserved." Of course, it is the

policy of the law, founded on excellent reasons, that street railroads shall not be customarily operated by means of steam power, and it is clear that, under the section from which we have just quoted, such motive power may be used only on the happening of the contingency provided for by said section; yet we can perceive no harm, even if it is not required, in inserting in the articles of incorporation a provision authorizing the use of steam power when the occasion for its use as contemplated by said section 509 arises. It is not to be assumed that the provision in the articles for "other motive power" than those means of propelling street-cars expressly enumerated by section 497 is intended to invest the corporation with power in that respect in any measure in excess of that prescribed by the several code sections on that subject.

The fact that the articles of incorporation contain authority for the extension of the street railroads proposed to be operated by the intended corporation beyond the territorial limits of the municipality of Los Angeles to points within the limits of the county in which said municipality is situated does not take from it the essential characteristics of a "street railroad." There is a clear and well-defined distinction in the contemplation of our law upon the subject of railroads between street railroads and those other railroads which may, for convenience, be designated "commercial" railroads, whose termini may be situated many hundreds of miles apart. Our supreme court has pointed out this distinction in many cases, notably in *San Francisco etc. Ry. v. Scott*, 142 Cal. 222, [75 Pac. 575], wherein it is established that, for purposes of taxation, the term "railroads," as employed in section 10 of article XIII of the constitution, is not to be interpreted to include street railroads, although the latter may be extended beyond the limits of one county and into another. It is perhaps true, as the attorney general suggests, that, while the term "railroads" may not, for a certain purpose, include street railroads, for other purposes such railroads may come within the generic term, "railroads." And, while the Scott case is not an authority directly in point here, it is, nevertheless, valuable in the case at bar in that it demonstrates that there is essentially a difference between the two classes of railroads following from

the different sources from which they respectively derive their authority to construct, maintain and operate railroads and the difference in the specific objects and purposes of the two.

In the Scott case, *supra,* it is said: "The franchise of an ordinary railroad is obtained upon terms and conditions equally applicable to all roads of its class by a compliance with the general law which empowers corporations to construct and operate a railroad between the designated termini, located, it may be, in counties widely separated. (Civ. Code, sec. 291.)   At the time the constitution was adopted the law provided that franchises for the construction and operation of street railroads along the streets and public highways could be obtained only from the governing body of the city or town in which it was situated.   (Civ. Code, sec. 497.) The law has been changed in some respects since that time, . but the substantial provision still remains that the franchise can only be obtained through the action of the council or governing body of the municipality.   (Civ. Code, sec. 497; Stats. 1901, p. 265; Stats. 1903, p. 90.) . . . The only way by which a company can operate a street railroad in more than one county is by obtaining separate franchises from the local authorities of the respective counties, so located that the ends of the two roads coincide at the county line, so that the two can be in fact operated as a continuous line running from one county into another.   But the franchises must remain separate and distinct, and *local in origin, situation and character.*   (Italics ours.) . . . In the case of an ordinary railroad the right which it may acquire to operate its road along a public street is, strictly speaking, a mere right of way, similar to the right it may acquire from land owners along the route.   It is a part of its roadway, and not a part of the franchise, within the meaning of the word in the phrase in question.   It imposes no implied obligation upon the grantee or donee to facilitate the local public use of the street by carrying persons from place to place thereon.   The right which a street railroad obtains from the city to lay its track and operate its road on a street, on the contrary, is the most valuable part of its franchise.   It carries the obligation to serve the public in the use of the street, and is in furtherance of the original use. *It does not receive this*

*franchise by becoming incorporated, as an ordinary road re-
ceives its franchise to operate its road between its termini,
but obtains it afterward by special grant from the municipal-
ity,* and the thing thus obtained includes both the roadway
and the franchise.'' (See *Railroad Com.* v. *Market St. Ry.*,
132 Cal. 677, [64 Pac. 1065] ; *Ferguson* v. *Sherman*, 116 Cal.
169, [47 Pac. 1023] ; *United Railroads etc.* v. *Colgan*, 153 Cal.
53, [94 Pac. 245].)

Thus it will be observed that there is a marked distinction
between the two classes of railroads, both as to the mode
and manner in which they are authorized to do business and
their objects and purposes. And we think that this distinc-
tion has been observed and recognized by the legislature in
its varying legislation with regard to the two classes of roads,
as we shall later on more particularly undertake to show.

Aside from the proposition that a street railroad corpora-
tion must, after it has become such, under our law, consum-
mate the purposes of its organization in a distinctly different
manner from that by which an ordinary railroad corporation
may, after establishing its legal entity, carry on the business
for which it is organized, the important feature which, in our
opinion, differentiates the two, and upon which line of dif-
ferentiation the legislature has framed our system of laws
with respect to railroad corporations, is to be found in the
fact that the street railroad is designed to solely and exclu-
sively transact a purely local traffic—a traffic which it would
be impracticable for the ordinary railroad to carry on, even
in those cases where its road runs through certain streets
of a city as a necessary part of its main road. But we think
the phrase ''street railroad,'' as used in our Civil Code, has
acquired and imports a much broader signification than the
word ''street,'' taken alone, would imply. Instances are
numerous where street railroads are extended a considerable
distance beyond the limits of the city or town to points where
there are maintained pleasure parks and gardens for recre-
ation and amusement (which is asserted to be a part of the
scheme of the proposed corporation), and, necessarily, in
such cases, there will generally be found long stretches of
country which such roads must lay their tracks upon which
are not within the city limits and over and through which
streets are not laid out. May it be said that, merely because

the road leaves the city limits for that purpose, it then, *ipso facto,* ceases to be a street railroad, but takes on the character of an ordinary railroad, subject to the regulations prescribed by the legislature for the incorporation, organization and operation of such roads? We think the answer is obvious; for we do not think that any court can be found that will sanction the proposition that, where a corporation is legally formed solely for the operation of a street railroad business and the road is extended, under authority of its articles of incorporation and the franchises granted by the local authorities, beyond the limits of the city in which its principal business is conducted for no other purpose than to extend its local street-car traffic, such road for that reason becomes in fact an ordinary railroad. No one would say or for a moment contend that because the street railroad company of Sacramento (if it be true) has extended its road to Oak Park or East Sacramento, suburbs of said city, situated outside its municipal limits, thus accommodating a large number of people, many of whom no doubt transact business in said city, becomes any less a street railroad. It in no manner or sense thus becomes a competitor of the ordinary railroads, its purpose and mission being, as are the purpose and mission of all street railroads, to meet a demand which the ordinary railroad, in the very nature of things, cannot meet. The purposes and objects of the two classes of roads may, by way of illustration, be likened to the relative positions of the wholesale and the retail merchant dealing in the same kind of commodities. In a general sense there is, of course, an analogy between them as merchants, but their special objects and purposes are essentially and distinctively different—the one supplying the trade, the other directly supplying the consumer.

But the most important contention of the attorney general is that the provisions of sections 291, 293, 294 and 295 of the Civil Code apply to *all* railroads, regardless of their character or the particular purpose for which they are designed. We do not assent to this contention.

In addition to what we have already said in support of our view that there is of necessity in many material respects a marked distinction—one that is recognized by the legislature throughout all its legislation with respect to railroads—

between street railroads and ordinary railroads, there are other considerations which, in our opinion, confirm the proposition in its application to the present question.

In the first place, it is as clear and unquestionable as any proposition can be that it would be absolutely impossible for proposed street railroad corporations to comply with all the requirements of section 291 of the Civil Code, unless the argument goes to the extent of maintaining that on every occasion that such a corporation, having designated the termini of its road in its articles, desired or found it necessary to extend its road to meet new conditions, which are, with respect to street railroads, constantly arising in growing cities, it would, for that purpose, be compelled to file additional or other articles of incorporation. Of course, the legislature intended to impose upon a street railroad company no such obligation as one of the prerequisites to its right to establish itself as a corporation. And no less impossible would it be for the average street railroad corporation to embrace in its articles of incorporation a statement of the "estimated length of the road" it intended to construct and operate. This would be especially true in large and growing cities. For illustration, we may say that it is known, as a matter of common knowledge, that there are ordinarily large portions of the territory of the larger cities which are slow to build up or to increase in population, and that it is only where such outlying districts grow in population to that extent that there is a demand for street-car accommodations, remunerative to the company, that street railroad corporations are justified in extending or will extend their service to such districts. New streets are often opened up and old ones extended or lengthened and thus new conditions arise which necessitate the extension of the local car service. It must, therefore, be plainly manifest that no street railroad corporation could insert in its articles of incorporation a statement of the probable length of its road. But there is another and more potent reason than any that has yet been suggested which would render it impossible for a street railroad company to give an estimate of the length of its road, and that reason grows out of the fact that municipalities themselves have full and complete control of and power over their streets, and whether such streets may or may not be

used by street-car companies rests entirely in the discretion of the governing bodies of such municipalities. If, therefore, a street railroad company should, in its articles of incorporation, either designate the termini of their road or give an estimate of the length, or do both, it would still remain with the local authorities to say whether the termini should be as designated or the length of the road as estimated. In other words, the termini and the length of a street railroad are subject to the determination of the local authorities by the franchises which the law provides must come after the company has been incorporated. Thus it must appear to be very plain that it is impossible for such corporations to designate in their articles of incorporation the termini of their road or roads, or to insert therein even an approximate estimate of the length of such road, or anything like such an estimate as is clearly intended shall be given, and which undoubtedly can accurately be given, by the ordinary railroads.

If, then, for the reasons suggested, these provisions of section 291 are not applicable to street railroads, may it still be held that the other provisions of said section and of the other sections mentioned are, nevertheless, applicable to such railroads? A negative reply to this question will, we think, be found in a further examination of the several titles and sections of the Civil Code bearing upon corporations and their formation.

That the legislature recognized and intended to classify street railroad corporations as distinct from the ordinary railroad corporations, we think is a proposition which offers little, if any, ground for serious controversy. While there is no provision of the code expressly classifying corporations, it is, nevertheless, to be observed that the legislature has practically classified them. There are provided for in the code twenty-two different classes of corporations, as to which there is specific legislation, each of said corporations being treated under a separate title; and it is to be remarked that, in the determination of the proposition whether the legislature recognized and intended to treat as different and distinct ordinary railroad and street railroad corporations, it is a fact of cogent and persuasive significance that the specific provisions relating to said corporations are, respectively, to be found under separate and distinct titles. This circum-

stance,. in connection with the legislation respecting railroad corporations as found in our Civil Code, is, itself, it seems to us, conclusive of the intention of the legislature to treat the two classes of railroads as different and distinct from each other. This is manifestly not a strained or unnatural interpretation of the intention of the legislature, but an interpretation which fully harmonizes with the essential distinction in the manner or mode in which the two corporations obtain their right to lay their tracks and operate their roads. Thus it will be noted that we have before us, as a guide to reaching the intention of the legislature with respect to the meaning and scope of the sections of the Civil Code under consideration, these significant propositions: 1. That it is impracticable to apply subdivisions 2 and 3 of section 291 to street railroad corporations; 2. That street railroads are treated in said code under the title, "Street Railroads," whereas the specific provisions as to ordinary commercial railroads are presented in the code under the title, "Railroad Corporations." In addition to the foregoing considerations, there is the mandate of section 510, which reads: "Street railroads are governed by the provisions of title III of this part, so far as they are applicable, unless such railroads are therein specially excepted." By the foregoing language the legislature very plainly emphasizes its intention to segregate railroads into two distinct classes, and as so segregated to enact as to each legislation peculiarly applicable thereto. If this does not necessarily follow from the terms of section 510, or if both classes of roads were to be governed by all the provisions of the code relative to railroads, so far as they are applicable, why enact section 510? And if it was intended that, so far as applicable, all said provisions should apply to street railroads, would not the legislature have expressly and specially so declared, as it has done with respect to the provisions of title III? There is but one answer to these questions, it seems clear to us.

It is, however, argued that the reason for requiring that it be disclosed by the articles of incorporation and the affidavit that ten per cent of the required amount of the capital stock subscribed has actually been "paid to a treasurer for the benefit of the corporation" applies with equal force to street railroad as well as ordinary railroad corporations.

This may be conceded, but the reply is that the right to incorporate and the prerequisites to the formation of corporations come from the legislature, and if that body has not seen fit to require one class of corporations, in order to become such, to do things which are required of other classes, it is not for the courts to supply the omission, however weighty and forceful the reasons may be that such omission should be supplied.

Our conclusion is that sections 291, 293, 294 and 295 have no application to street railroad corporations, and that it is, therefore, unnecessary for petitioners to insert in their articles of incorporation the matters set forth in subdivisions 2, 3 and 4 of section 291 of the Civil Code, or to file with the Secretary of State the affidavit provided for by section 295 of said code. In other words, we think the articles of incorporation presented for filing to respondent, and of which a copy is annexed to the petition herein, are sufficient in all particulars and that it is the duty of the Secretary of State to file the same upon the receipt of the proper fee therefor.

The demurrer to the petition will be overruled, and in accordance with this order let a writ of mandate issue out of this court to the respondent, Hon. Charles F. Curry, as Secretary of State, requiring and compelling him to file said articles of incorporation in his said office of Secretary of State.

Chipman, P. J., and Burnett, J., concurred.