OMAHA & C. B. ST. RY. CO. et al. v. INTERSTATE COMMERCE COMMISSION (UNITED STATES, Intervener).

(Commerce Court. October 5, 1911.)

No. 25.

1. COMMERCE (§ 85*)—POWERS OF INTERSTATE COMMERCE COMMISSION—REGULATING FARES OF INTERSTATE STREET RAILROAD.

In a proceeding before the Interstate Commerce Commission the complaint alleged that respondent, a street railroad company, operated electric lines in Omaha, and also, under lease, a line in Council Bluffs, extending over a bridge across the Missouri river and around a loop covering several blocks in the business section of Omaha; that interstate passengers on the latter line were charged a fare of 10 cents between points in Council Bluffs and points on the loop in Omaha, and of 15 cents between points in Council Bluffs and points on respondent's lines in

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Omaha beyond the loop; that local fares to and from all points in Omaha, whether on or off its loop, were 5 cents. It charged that the 10-cent fare was excessive, and prayed that just and reasonable fares be established for the transportation of passengers between the two cities. *Held* that, under the issues, it was within the power of the Commission, conceding that it had jurisdiction of the case, to eliminate the loop boundary for the 10-cent fare, and require the company to carry passengers between all points on its lines in Council Bluffs and Omaha, respectively, for a single fare of 10 cents.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 85.*]

**2.** COMMERCE (§ 85*) — SCOPE OF INTERSTATE COMMERCE ACT — INTERSTATE STREET RAILROADS.

An electric interurban street railway company doing an interstate business in the carriage of passengers, although incorporated under the street railroad statutes of a state, and not authorized to carry freight, nor vested with the right of eminent domain, is subject to the provisions of Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1909, p. 1149), and under section 15 as amended by Act June 18, 1910, c. 309, § 12, 36 Stat. 551, the Interstate Commerce Commission has jurisdiction to prescribe just and reasonable maximum rates to be charged by such company for the interstate carriage of passengers.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 85.*]

**3.** COMMERCE (§ 85*)—CONSTRUCTION OF INTERSTATE COMMERCE ACT—SCOPE.

A statute of the scope of the interstate commerce act, designed to regulate the vast interstate transportation business of the country, is not to be narrowly interpreted in accordance with the economical or physical conditions prevailing at the time of its enactment.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 85.*]

**4.** COMMERCE (§ 85*)—"RAILROAD."

An electric street railway doing an interstate business in the carriage of passengers, although incorporated under the street railroad statutes of a state, and not authorized to carry freight, nor vested with the right of eminent domain, is a "railroad," within Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1909, p. 1149).

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 85.*

For other definitions, see Words and Phrases, vol. 7, pp. 5899–5908; vol. 8, pp. 7777, 7778.]

Petition by the Omaha & Council Bluffs Street Railway Company and Omaha & Council Bluffs Railway & Bridge Company against the Interstate Commerce Commission, in which the United States intervened. On demurrer to bill. Demurrer sustained, and bill dismissed.

For opinion and order of the Interstate Commerce Commission, see 17 Interst. Com. Com'n R. 239. For opinion of Circuit Court granting preliminary injunction, see 179 Fed. 243.

John Lee Webster, for petitioners.

Blackburn Esterline, Sp. Asst. Atty. Gen., for the United States.

Charles W. Needham, for Interstate Commerce Commission.

Before ARCHBALD, HUNT, CARLAND, and MACK, Associate Judges.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

MACK, Judge.   The Omaha & Council Bluffs Railway & Bridge
Company, hereinafter referred to as the Bridge Company, an Iowa cor-
poration, constructed, under authority of an act of Congress (Act
March 3, 1887, c. 356, 24 Stat. 501 [U. S. Comp. St. 1901, p. 3154]),
and now owns, a joint railroad, wagon, and foot toll bridge over the
Missouri river at Omaha, Neb., and Council Bluffs, Iowa, and also
owns a railway, which begins at the west end of the bridge in Omaha,
·Neb., and extends eastward across the bridge to Council Bluffs, Iowa.
The Bridge Company also owns the stock and bonds of the Omaha,
Council Bluffs & Suburban Railway Co., a street railway line in Coun-
cil Bluffs. The Omaha & Council Bluffs Street Railway Company,
hereinafter referred to as the Street Railway Company, owns and op-
erates all of the street railway lines in Omaha, Neb., in addition to
which, in January, 1903, it leased all of the properties of the Bridge
Company for a period of years, so that it now operates all of the
lines of both systems.

Foot passengers pay 5 cents bridge toll. Local street car fare in
either city is 5 cents.   Interstate street railway passengers pay no
direct bridge toll, but a single fare of 10 cents, or $1.50 for 30 com-
mutation tickets, for a ride to or from any point on the line in Coun-
cil Bluffs, except Courtland Beach, over the bridge from or to any
point on the line of the street railway company within the so-called
loop in Omaha.   Interstate passengers to or from a point in Omaha
beyond the loop receive no transfers, but according to the practice
sought to be corrected are required to pay an additional local fare of
5 cents.   The loop district in Omaha extends westward on Douglas
to Fourteenth street, south upon that street to Howard, east to Elev-
enth, north to Douglas, and eastward back to the bridge.

On complaint the Interstate Commerce Commission refused to re-
duce the 10-cent fare to 5 cents, but abolished the loop limitation in
Omaha, ordering the Bridge and Street Railway Companies not to
charge more than 10 cents to or from any point on the line in Omaha
from or to Council Bluffs, except Courtland Beach.   The report of
the Commission will be found in West End Improvement Club v.
Omaha & Council Bluffs Ry. & Bridge Co., 17 Interst. Com. Com'n
R. 239.   A bill was thereupon filed in the Circuit Court of the United
States for the District of Nebraska, and a preliminary injunction was
granted against the enforcement of this order.   Omaha & C. B. St.
Ry. Co. v. I. C. C., 179 Fed. 243.   The case was subsequently trans-
ferred to this court, and is now up for disposition on a demurrer to
the bill, except as to one paragraph, which is answered by adding
to the order of the Commission its report, thus making the latter a
part of the record.

[1] On the oral argument, though not in the briefs, it was sug-
gested, in accordance with the charges of the bill, that the order of
the Commission, in practically compelling the Street Railway Company
to give transfers in Omaha, went both beyond the issues in the case
before the Commission and beyond its constitutional as well as its
statutory powers, in that it thereby attempted to regulate the strictly
intrastate affairs of the Street Railway Company by an order which

had no reference to the transportation over the bridge, but to what should happen after it was complete, compelling the company in effect to render an additional service without compensation. But the complaint before the Commission was that the 10-cent fare between Council Bluffs, Iowa, and Omaha, Neb., was unreasonable and unjust, and it was prayed that the defendants be required to make and fix passenger fares to apply in future to the transportation of passengers from Council Bluffs to Omaha, and the reverse, which should not exceed 5 cents per passenger, or such charge as the Commission should find reasonable and just. The report recited that the complainant assailed the 10-cent fare between the two cities over the bridge as unreasonable, and prayed that "no extra charge be made when in the course of interstate transportation passengers are carried over such bridge," and the establishment of a 5-cent fare.

While the primary object aimed at was the reduction of the 10-cent fare to 5 cents, the prayer for the abolition of all extra charges and the fixing of a reasonable rate for interstate passenger transportation between the two cities fairly included, in our opinion, the elimination of the loop boundary for the 10-cent fare. Moreover, the Commission expressly states in the report that "the reasonableness of confining it [the 10-cent fare] to points on the loop is put in issue in these proceedings."

The lines from the bridge in Omaha to and through the loop do not constitute a system separate and distinct from those beyond the loop. Both are under the common ownership, control, and operation of the Street Railway Company. Local passengers pay a single fare within the city of Omaha between all points, receiving the necessary transfers at junction points to and from the loop.

The question presented was, therefore, not whether an independent company operating solely in Omaha beyond loop points and exchanging transfers solely for local passengers with an interstate company operating the loop lines could be compelled to give transfers to interstate passengers as well—as to which we intimate no opinion—but whether or not the interstate company, operating all the lines as one system, the parts of which are independently operated only in a physical sense, in that transfers are necessary from and to the loop, could be compelled, without additional compensation, to carry an interstate passenger to a point on its own lines beyond the loop district; in other words, whether 15 cents is or is not a reasonable fare to be paid for the entire interstate journey made on the several lines operated by the Street Railway Company. So stated, the question is obviously one of the reasonableness of interstate passenger rates, and as such clearly within the jurisdiction of the Commission, if it has any jurisdiction over corporations such as the Street Railway Company.

[2] Complainants do, however, allege—and this brings us to a consideration of the principal and important question in the case—that the Interstate Commerce Commission, under the act, has no jurisdiction over interstate passenger rates charged by a corporation engaged in the business in which the Street Railway Company is engaged here.

The judges of the Circuit Court before whom the case originally.

came, in granting a preliminary injunction, held that the complainants were street railway companies engaged in operating street cars for passenger transportation, and not commercial railroad companies engaged in the general transportation of freight and passengers, and as such did not come within the class of corporations over whose rates the Interstate Commerce Commission has been granted jurisdiction. The cases cited in support of this view involved the interpretation of various state acts establishing commissions, regulating taxes, providing for joint rates or connections, giving mechanic's liens, abolishing the fellow servant rule, or in other ways dealing with railroad problems. Under these statutes it was held that, inasmuch as commercial railroads and street railways were classified separately by the Legislatures, electric street railways would not be deemed to be embraced within the general term "railroad," as used in such acts. The principal of these cases, which cite the others, are R. R. Commission v. Market Street R. R. Co., 132 Cal. 677, 64 Pac. 1065, and Sams v. St. Louis, etc., Ry. Co., 174 Mo. 53, 73 S. W. 686, 61 L. R. A. 475. In each of these there was a vigorous dissenting opinion.

No court decision has been found directly involving an interpretation on this point of the federal act to regulate commerce, although in the Employer's Liability Cases, 207 U. S. 463, at page 497, 28 Sup. Ct. 141, at page 145 (52 L. Ed. 297), Mr. Justice (now Chief Justice) White said:

"From the first section it is certain that the act extends to every individual or corporation who may be engaged in interstate commerce as a common carrier. Its all-embracing words leave no room for any other conclusion. It may include, for example, steam railroads, telegraph lines, telephone lines, the express business, vessels of every kind, whether steam or sail, ferries, bridge, wagon lines, carriages, trolley lines, etc."

The conclusion of the Interstate Commerce Commission that it has such jurisdiction is supported by its earlier decision in Willson v. Rock Creek Ry. Co., 7 Interst. Com. Com'n R. 83, and by its later decision in Beall v. Washington, Alexandria & Mt. Vernon Ry. Co., 20 Interst. Com. Com'n R. 406. While two Commissioners dissented as to the jurisdictional question in the Rock Creek Ry. Co. Case in 1897, all concurred in the order which is sought to be enjoined in the present case; Prouty, C., speaking as well for Commissioners Knapp and Cockrell as for himself, making the following statement:

"In Willson v. Rock Creek Ry. Co., 7 Interst. Com. Com'n R. 83, I expressed the opinion that the act to regulate commerce did not apply to ordinary street railways. I still entertain the same opinion, but a majority of the Commission thought otherwise in that case, and for the 12 years since we have uniformly adhered to that holding. It seems to me that this should be accepted as the settled law for this body until reversed by a majority of the Commission or disapproved by a court of competent jurisdiction."

The fact that the opinion of the majority of the Commission in the Rock Creek Railway Co. Case has been acted on for so many years should compel us to hesitate before adopting an interpretation of the act contrary to that of the Commission. On the other hand, the opinion of such experienced judges as granted the preliminary injunction in the present case and the doubts of our colleague, the presiding

judge of this court, while chairman of the Commission, and of his two associates, necessitate a careful examination of the question in the endeavor to ascertain whether or not, even though certain words, literally construed, may be held to grant the jurisdiction, a reasonable interpretation of the entire act, in the light of its history and of the evils sought to be remedied and of the later amendments, supports the literal construction; in a word, whether sound interpretation of both the spirit and the letter of the statute sustains the jurisdiction of the Commission.

There is no question that Congress could have granted jurisdiction over interstate street railway companies carrying only passengers. Neither is it controverted that, under the act, the Commission has jurisdiction over some corporations engaged in interstate transportation of passengers alone, as well as over some corporations engaged in interstate transportation using electricity instead of steam as the motive power. But it is argued that, as the act itself shows, Congress never intended to exercise its power of regulation over all persons or corporations engaged in interstate transportation (having expressly excluded water carriers, for instance, except where operating in direct connection with a railroad under a common arrangement for continuous carriage) ; that the evils which compelled the intervention of Congress were due to the acts and omissions of the great railroad systems; that street railways in 1887 were ordinarily purely local and municipal, operated mostly by animal power and fully regulated by municipal ordinances; that many of the provisions of the act are entirely inapplicable to street railways; that commercial railroads, operated ordinarily by steam and vested with rights of eminent domain, are generally differentiated in legislation from street railways operated to-day ordinarily by electricity, generally not endowed with the right of eminent domain, and running usually upon city streets and public highways and not on private property; and that for these, as well as for other reasons, electric interurban passenger street railways are not included within the classes of common carriers over which jurisdiction was granted by section 1 of the act, as amended by Act June 29, 1906, c. 3591, 34 Stat. 384 (U. S. Comp. St. Supp. 1909, p. 1149). The relevant part of this section as it was in force when these proceedings were begun in the Circuit Court is copied.[1]

1 Sec. 1. That the provisions of this act shall apply to any corporation or any person or persons engaged in the transportation of oil or other commodity, except water and except natural or artificial gas, by means of pipe lines, or partly by pipe lines and partly by railroad, or partly by pipe lines and partly by water, who shall be considered and held to be common carriers within the meaning and purpose of this act, and to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad (or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment) from one state or territory of the United States or the District of Columbia to any other state or territory of the United States or the District of Columbia, or from one place in a territory to another place in the same territory, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States, and also to the transportation in like

Intermediate between the ordinary urban street railways, which, in the case of cities or towns near each other, whether in the same state or not, become state or interstate interurban surface railways carrying only passengers, and the commercial railroads carrying passengers and freight and operated usually by steam, are the so-called interurban electric roads. These have been organized, or at any rate have become important factors in transportation, since 1887. They usually carry mail, express matter, and some freight, as well as passengers, and do not only a local business in more than one city and between cities, but also between city and country. It is conceded by counsel that corporations operating such roads, even though differing in many respects from so-called commercial railroads, come within the jurisdiction of the Commission when engaged in interstate transportation. The Commission so held in C. & M. Elec. R. R. Co. v. I. C. R. R. et al., 13 Interst. Com. Com'n R. 20, and C. & C Traction Co. v. B. & O. S. W. R. R. Co., 20 Interst. Com. Com'n R. 486. In Nebraska and some other states corporations operating such interurban roads are, moreover, created under the general railroad acts.

The present Street Railway Company differs from this class of interurban roads, in that it is created under the street railway act of Nebraska; it does not, and is not empowered to, carry freight; and, moreover, unlike some interurban roads, it has no right of eminent domain. Like these, however, it carries mail; it serves not one but two cities and several towns, villages, and resorts; and though the bill of complaint alleges that the rails of the street railway company are all on streets and highways, it does not deny the statement in the report of the Commission, referring probably to the leased lines of the bridge company, that the rails are not all laid in streets and highways, but for some distance run over private right of way and over the bridge across the Missouri river.

While, as complainant urges, the Nebraska corporation is the only party actually affected by the order, nevertheless the order is directed against it, not in relation to its business as a local Nebraska street railway corporation, but to its business as a carrier engaged in interstate transportation. As such carrier it is the successor of the Iowa corporation, the Bridge Company. Whatever may be the latter's char-

manner of property shipped from any place in the United States to a foreign country and carried from such place to a port of transshipment or shipped from a foreign country to any place in the United States and carried to such place from a port of entry either in the United States or an adjacent country: Provided, however, that the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of the property wholly within one state and not shipped to or from a foreign country from or to any state or territory as aforesaid.

The term "common carrier" as used in this act shall include express companies and sleeping car companies. The term "railroad," as used in this act, shall include all bridges and ferries used or operated in connection with any railroad, and also all the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement, or lease, and shall also include all switches, spurs, tracks, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, and also all freight depots, yards, and grounds used or necessary in the transportation or delivery of any of said property.

ter limitations as an Iowa corporation, it erected the bridge and the lines thereon (both now leased to and operated by the Street Railway Company) under power granted to it by Congress to construct, operate, and maintain the bridge and a "steam, electric, * * * or other line of railway."

Whether or not the Street Railway Company is empowered as a Nebraska corporation to operate the bridge and the Iowa lines is immaterial in this case. It is, rightly or wrongly, engaged in their operation, and it is, therefore, a common carrier engaged in the interstate transportation of passengers by electric railway.

It is likewise immaterial to this inquiry that the Street Railway Company is created under the street railway and not under the commercial railroad act of Nebraska. If, soundly interpreted, the federal act gives the Commission jurisdiction over such electric railways, state legislation is powerless to limit or to prevent such grant.

Does, then, the lack of statutory power to carry freight and to exercise the right of eminent domain, so differentiate such a corporation as this street railway company from the modern interurban roads, as to exempt it from the jurisdiction of the Commission?

Great stress is laid upon a statement by Senator Cullom, chairman of the Senate committee, when the original act of 1887 was under consideration (Cong. Rec. vol. 17, pt. 4, p. 3472), that:

"The bill is not intended to affect the stagecoach, the street railway, the telegraph lines, the canal boat, or the vessel employed in the inland or coasting trade, even though they may be engaged in interstate commerce, because it is not deemed necessary or practicable to cover such a multitude of subjects."

But, whatever view may have been so expressed, it cannot determine the correct interpretation of the act, particularly as it now stands, with all the changes that have been introduced since 1887.

If the language be broad enough to include such a corporation as the present Street Railway Company, and there is no contention but that "railroad" may be and frequently is synonymous with or inclusive of "street railways," it is, moreover, immaterial that Congress may not specifically have intended to confer jurisdiction over the few comparatively insignificant interstate horse street railways of 25 years ago.

[3] A statute of the scope of the interstate commerce act, designed to regulate the vast interstate transportation business of the country, is not to be narrowly interpreted—any more than the Constitution—in accordance with the economic or physical conditions prevailing at the time of its adoption. Then, too, the decision in Wabash, St. Louis, etc.. Railway Co. v. Illinois, 118 U. S. 557, 7 Sup. Ct. 4, 30 L. Ed. 244, definitely denying to the states the right to fix or regulate interstate rates for passengers, and thereby necessitating some congressional action, is as applicable in its reasoning to interstate street railway rates as to those of commercial railroads. Unless the Commission has jurisdiction over those rates they are absolutely uncontrolled.

As noted above, while Congress has expressly excluded water carriers, except when operated in direct connection with a railroad, it

has not expressly excluded street railways. Moreover, the act has been several times amended since the Rock Creek Railway Co. Case; and not only has Congress thus by its failure to exclude street railways apparently concurred in the construction there given, but by the latest amendment it has, in fact, given its apparent sanction thereto.

In 1910 (Act June 18, 1910, c. 309, § 12, 36 Stat. 551) section 15 of the act was amended to read:

"The Commission shall not, however, establish any through route, classification, or rate between street electric passenger railways not engaged in the general business of transporting freight in addition to their passenger and express business and railroads of a different character"

—which is the first specific mention of street electric passenger railways. This proviso, following the grant of power to establish through rates, etc., between railroad carriers, would have been totally unnecessary unless the Commission had theretofore had jurisdiction over street electric passenger railways. Congress, therefore, must have enacted the legislation of 1910 upon the assumption that such jurisdiction had been conferred upon the Commission by the original act.

The argument that many of the requirements of the act would be impossible of accomplishment by street railways does not impress us, inasmuch as this is at least equally true of sleeping-car companies, pipe lines, telegraph and telephone companies, all of which are expressly covered by the statute. As to each of them only such of its provisions as are applicable will be deemed to refer to such companies, respectively.

The frequent repetition of the phrase "passengers *or* freight" clearly indicates that a carrier of passengers only is as subject to regulation by the Commission as is a carrier of both freight and passengers.

Finding substantially nothing either in the language of the statute or in the history of this legislation that indicates an intent to exclude interstate passenger street railways from its operation, and finding, on the contrary, that the words of the act are broad and comprehensive enough to include them, and that some at least of the evils sought to be remedied by this legislation can be corrected only if the Commission have such jurisdiction, we are compelled to differ from the views expressed by the Circuit Court in granting the preliminary injunction, and to hold that power has been delegated to the Commission to regulate rates of transportation by such companies as the complainants herein, which requires us to sustain the demurrer of the defendants and to dismiss the bill. And it is so ordered